**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Thomas Scott WILSON, Defendant–Appellant.**

No. 91–8423.

United States Court of Appeals, Eleventh Circuit.

Feb. 12, 1993.

Donald F. Samuel, Garland & Samuel, Atlanta, GA, for defendant-appellant.

Michael J. O'Leary, Asst. U.S. Atty., Atlanta, GA, for plaintiff-appellee.

Before TJOFLAT, Chief Judge, FAY and COX, Circuit Judges.

PER CURIAM:

Thomas Scott Wilson sold credit card numbers accumulated by his telemarketing business to an undercover Secret Service agent. After a jury trial in district court, Wilson was convicted of bank fraud in violation of 18 U.S.C. § 1344 (Supp.1991) and of possessing and selling unauthorized credit card numbers in violation of 18 U.S.C. § 1029(a), (b) (1988). Wilson raises several arguments on this direct appeal to challenge his convictions and his sentences. Among other things, Wilson objects to the cross-examination of his character witnesses and to the special assessment imposed on each of the twenty-five counts of bank fraud that arose from his transaction with the undercover agent. Finding no error, we affirm the convictions and sentences.

## I. BACKGROUND

Wilson was the manager and forty percent owner of a telemarketing firm, Pathway Products ("Pathway"). Pathway sold substances that promised to help buyers shed weight or grow hair, depending on the product. Many of Pathway's customers provided their credit card numbers when ordering the goods. The numbers were entered into the company's computer along with customers' names and purchases. On two occasions in late 1989, Wilson talked to his general sales manager, Alexis Conner, about locating a buyer for Pathway's list of customers and credit card numbers. Conner testified that she refused his first request for help because she believed such a sale would be illegal. At Wilson's "persistent" second request, Conner invented a name of a possible buyer and told Wilson she could not help him further.

After Pathway went out of business in February 1990, Wilson kept its computer equipment and the reels of computer tape with the customer information. He again spoke with Conner about selling the computer tape. This time Conner notified a bank security officer and the Secret Service. At the direction of Secret Service agents, Conner had several other discussions with Wilson about selling Pathway's lists. Two of their telephone conversations were recorded by the Secret Service. Conner arranged for Wilson to meet an undercover agent posing as a buyer of credit card numbers. The two meetings between Wilson and the agent also were secretly recorded.

In his first meeting with the undercover agent, Wilson estimated that the five reels of computer tape contained a total of 1.6 million numbers. Wilson and the agent negotiated the sale of 25,000 numbers for $100,000. The following day Wilson was arrested after selling the agent a printout of names and credit card numbers in exchange for $100,000 in cash.

The indictment against Wilson contained twenty-eight counts: one count of trafficking in unauthorized access devices (credit card numbers) in violation of 18 U.S.C. § 1029(a)(2) (1988); one count of possession of unauthorized access devices in violation of 18 U.S.C. § 1029(a)(3), (b) (1988); twenty-five counts of engaging in a scheme or artifice to defraud a financial institution in violation of 18 U.S.C. § 1344 (Supp.1991); and one count of conspiracy to sell the credit card numbers in violation of 18 U.S.C. § 371 (1988).

Wilson has admitted selling the list of names and credit card numbers to the undercover agent. His defense at trial was that in selling the lists, he did not intend to defraud the banks or the individual cardholders. According to Wilson, "he was simply selling the list of his defunct company's customers." He points out that the list included the names of many C.O.D. customers, who had not given their credit card numbers. The sale of customers' names and purchasing information, also known as "leads," is common in the telemarketing field, Wilson says.

The district court directed an acquittal on the conspiracy count at the close of the

government's case. A jury found Wilson guilty of all remaining charges. The court sentenced Wilson to concurrent prison terms of thirty-seven months on each of the twenty-seven remaining counts, to be followed by three years of supervised release. Wilson also was ordered to pay a $5,000 fine and a special assessment of $1350.

## II.  ISSUES

A.  Whether the district court committed reversible error by allowing the prosecutor to ask two of Wilson's character witnesses whether their favorable opinions of Wilson would have changed had they known that he sold credit card numbers to an undercover Secret Service agent.

B.  Whether the twenty-five counts of bank fraud, all arising from the same sale of one list of names and numbers, are multiplicious.[1]

## III.  DISCUSSION

### A.  *The Questioning of Wilson's Character Witnesses*

■ A district court has "wide discretion" to control the cross-examination of character witnesses. *Michelson v. United States*, 335 U.S. 469, 480, 69 S.Ct. 213, 221, 93 L.Ed. 168 (1948). This discretion "is accompanied by heavy responsibility ... to protect the practice from any misuse." *Id.* Nevertheless, we will disturb the district court's ruling "only on clear showing of prejudicial abuse of discretion." *Id.* We hold that Wilson has shown no abuse of discretion by the district court in the cross-examination of his character witnesses.

■ Wilson called three character witnesses to help establish that he lacked fraudulent intent when he sold the credit card numbers. The witnesses testified that Wilson had a good reputation in the community for honesty and integrity, and they expressed similarly favorable personal opinions about his character. On cross-examination, the prosecutor asked one of the witnesses: "If you knew that Mr. Wilson had sold credit card numbers to an undercover agent, would your opinion change?" (R. 7 at 324.) The prosecutor posed the following question to another witness: "Let me just ask you if you knew that Mr. Wilson had sold individuals' credit card numbers to an undercover secret service agent ... would your opinions relative to his integrity and honesty change at all?" (R. 7 at 328.)[2] Wilson's counsel objected to both questions; the district court overruled the objections. In their responses, neither witness indicated that his opinion of Wilson would have changed.

Wilson contends that the witnesses could not answer the questions without assuming his guilt. Therefore, Wilson believes that the questions improperly detracted from the presumption of innocence to which he was entitled. Our predecessor circuit cited such a concern when it condemned guilt-assuming hypothetical questions asked of witnesses who have testified about a defendant's good reputation. *United States v. Candelaria–Gonzalez*, 547 F.2d 291 (5th Cir.1977).[3] Such hypothetical questions are

---

1. Wilson raises two other issues as well: he contends that the Government failed to prove that the credit card numbers were "unauthorized" within the meaning of 18 U.S.C. § 1029(e)(3) (1988), and he challenges the district court's calculation of his sentencing range based on a $100–per–card presumed loss as provided by United States Sentencing Commission, *Guidelines Manual*, §§ 2B1.1, comment. (n. 4), 2F1.1, comment. (n. 7) (Nov. 1992). We find these claims to be without merit, and we reject them without further discussion.

2. This is the full text of the question. The omitted material consists of an objection by Wilson's counsel and the district court's response overruling the objection.

3. The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

irrelevant to a defendant's reputation, and they strike "at the very heart of the presumption of innocence." *Id.* at 294. Therefore, the questions "have no place in a criminal trial." *Id.* Although the Fifth Circuit later explained that "one asking" of a guilt-assuming question does not constitute plain error, *United States v. Palmere,* 578 F.2d 105, 107 (5th Cir.1978), *cert. denied,* 439 U.S. 1118, 99 S.Ct. 1026, 59 L.Ed.2d 77 (1979), it is clear that the questions may necessitate reversal in some instances.

The Government defends the questions by calling them "highly relevant" to the credibility of the personal opinions offered by Wilson's character witnesses. (Appellee's Br. at 19.) The Government argues that, unlike the situation in *Candelaria–Gonzalez,* the questions went to the witnesses' own opinions rather than their testimony about Wilson's reputation. Also, even if the district court erred by allowing the questions, the Government views the error as harmless in light of the considerable evidence against Wilson and the court's later jury instruction about the presumption of innocence.

The Government's opinion-reputation distinction finds support in *United States v. White,* 887 F.2d 267 (D.C.Cir.1989). In *White* the court saw nothing wrong with guilt-assuming questions posed to witnesses who had given their personal opinions of the defendant's character, although the court acknowledged that such questioning of reputation witnesses "may be improper." *Id.* at 274–75. Other circuits, however, have treated opinion and reputation witnesses alike in disapproving of guilt-assuming questions, notwithstanding the questions' relevancy to opinion testimony. *See United States v. Oshatz,* 912 F.2d 534, 539 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991); *United States v. Williams,* 738 F.2d 172, 177 (7th Cir.1984). Moreover, the Government's focus on relevancy ignores the fact that even relevant questions may be prohibited to avoid a risk of unfair prejudice. *See* Fed.R.Evid. 403.

We need not enter the reputation-opinion debate to resolve the issue now before us, nor do we find it necessary to undertake a harmless-error analysis. Concerns about guilt-assuming questions arise only if the questions do indeed assume the defendant's guilt. The questions put to Wilson's witnesses stopped short of that troubled ground, if barely. The witnesses were asked about nothing more than Wilson already had admitted during his time on the stand: he sold credit card numbers to an undercover Secret Service agent. Wilson had denied any fraudulent intent. The questions attributed no intent to him. Therefore, the questions did not assume Wilson's guilt.

The Ninth Circuit recently reached the same conclusion about similar questions in *United States v. Velasquez,* 980 F.2d 1275 (9th Cir.1992). The defendant in *Velasquez* admitted walking into a bank, showing the branch manager an inactive hand grenade and asking if the manager could open the vault. At his subsequent trial for attempted bank robbery, the defendant denied that he had intended to rob the bank. He said that, because of personal problems, he had wanted to be arrested. Two character witnesses testified that they did not consider the defendant to be a violent person. On cross-examination, the prosecutor asked one character witness if her opinion would change if it were established that the defendant had taken a grenade into the bank and inquired about money. The second character witness was asked if he would agree that a bank robbery by a man carrying a hand grenade was a violent act, although the grenade turned out to be inactive. The Ninth Circuit concluded that the questions did not assume that the defendant was guilty. The court explained:

The factual content of the prosecutor's questions had already been presented to the jury by the defense counsel in his opening statement. Velasquez argues that the prosecutor's questions assumed that he entered the bank with a violent intent and with the intent to steal money. This assertion is not supported by a review of the questions asked. The prosecutor did not ask the witnesses what

they would think if it was shown that Velasquez entered the bank with bad intentions. The prosecutor only asked the witnesses how they would interpret the acts that the defense counsel stated in his opening statement had occurred.

*Velasquez*, 980 F.2d at 1275.

Under different circumstances, questions virtually identical to those that Wilson finds offensive might create serious problems by requiring witnesses to assume something that a defendant has not conceded. In the context of Wilson's trial, however, the district court did not abuse its discretion when it allowed the prosecutor to ask Wilson's character witnesses about his acknowledged transaction with the Secret Service agent.

### B. The Twenty–Five Bank Fraud Counts

■ Wilson argues that the single sale of a single list of names and credit card numbers should be considered only one "scheme" to defraud a financial institution in violation of 18 U.S.C. § 1344. If only one scheme was involved, only one count of bank fraud was warranted. Because his separate prison terms were to run concurrently, Wilson acknowledges that a decision favorable to him on this issue would affect only the special assessment imposed by the district court and not the length of his incarceration. [Appellant's Br. at 15 n. 4.]

Wilson did not object to the multiple counts before or during his trial or at his sentencing hearing. Thus he failed to preserve the multiplicity issue as a ground for appeal. In light of this holding, we do not reach the merits of his argument.

A defendant must object before trial to any defects in an indictment. *See* Fed. R.Crim.P. 12(b)(2). The failure to raise such a pretrial objection "shall constitute waiver thereof." Fed.R.Crim.P. 12(f). Thus, Wilson's failure to object to the multiple counts of bank fraud before his trial now bars him from challenging his convictions on the ground of multiplicity. *See United States v. Grinkiewicz*, 873 F.2d 253, 255 (11th Cir.1989).

Wilson argues that he may nevertheless appeal the imposition of multiple sentences based on the separate bank fraud convictions. This circuit has allowed such appeals of sentences, as opposed to convictions, in the absence of a Rule 12(b)(2) objection. *See id.; United States v. Davis*, 799 F.2d 1490, 1494 (11th Cir.1986). The Government, however, contends that Wilson also has waived his right to appeal the multiple sentences by failing to object to them at his sentencing hearing.

A year before Wilson's April 24, 1991, sentencing hearing, this court announced a new rule to govern sentencing procedures. *See United States v. Jones*, 899 F.2d 1097, 1103 (11th Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 275, 112 L.Ed.2d 230 (1990). The rule became effective several months before Wilson was sentenced. As it pertains to Wilson, the *Jones* rule provides:

Where the district court has offered the opportunity to object and a party is silent or fails to state the grounds for objection, objections to the sentence will be waived for purposes of appeal, and this court will not entertain an appeal based upon such objections unless refusal to do so would result in manifest injustice.

*Id.*

For example, in *United States v. Smitherman*, 956 F.2d 1131, 1131 (11th Cir.1992), the district court followed the *Jones* procedure. The defendant did not object to his sentence or the sentencing process on ex post facto grounds. On appeal, this court held that the defendant had waived the ex post facto claim. *Id.*

Application of the *Jones* rule in this case is not inconsistent with the line of cases which hold that the failure to raise a 12(b)(2) objection before trial does not bar an appeal of multiple sentences. Those cases do not address the consequences of a subsequent failure to object at sentencing.

The transcript of the sentencing hearing in the present case shows that the district court complied with *Jones* by giving Wilson an opportunity to raise specific objections after the sentence was imposed. The following colloquy occurred between the court and Wilson's attorney:

226

[The Court:] Anything further? First of all, are there any exceptions to the findings made in the sentencing hearing?

[Wilson's attorney]: Yes. Do I need to elaborate on those?

The Court: You are supposed to state any exceptions.

(R. 4 at 423–24.)

The attorney listed three objections, none of which involved the multiplicity issue. We see no "manifest injustice," so under *Jones* we decline to entertain Wilson's claim that the bank fraud charges are multiplicious.

### CONCLUSION

Wilson's convictions and sentences are AFFIRMED.